UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HOWARD W., WENDY W., and KATHRYN H.-W.,<br><br>    Plaintiffs,<br><br>  v.<br><br>PROVIDENCE HEALTH PLAN, and the SWEDISH HEALTH SERVICES EMPLOYEE BENEFITS PLAN, 519,<br><br>    Defendants. | CASE NO. 2:21-CV-01346-JHC<br><br>ORDER RE: MOTIONS FOR SUMMARY JUDGMENT |

## I

### INTRODUCTION

Plaintiffs Howard W., Wendy H., and Kathryn H.-W., bring suit against Defendants Providence Health Plan (PHP) and Swedish Health Services Employee Benefits Plan, 519 (Plan) under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*. Plaintiffs bring two causes of action: (1) to recover benefits under 29 U.S.C. § 1132(a)(1)(B); and (2) for a violation of the Mental Health Parity and Addiction Equity Act of 2008 (Parity Act), which is enforceable under ERISA, 29 U.S.C. § 1132(a)(3). Before the Court are the parties' cross-motions for summary judgment. Dkts. ## 44, 51. The Court has considered the materials filed in support of, and in opposition to, the motions, and the balance of the case file.

The Court also heard oral argument on the cross-motions.  Being fully advised, and for the reasons below, the Court GRANTS Defendants' motion and DENIES Plaintiffs' motion.

## II

### BACKGROUND

A.    The Parties

Plaintiffs Howard W. and Wendy H. seek reimbursement for their daughter H.-W.'s stays at Pacific Quest, an outdoor "wilderness program" in Hawaii, and Maple Lake Academy (Maple Lake) in Utah.  AR_001655[1]; Dkt. # 2 at 2.  H.-W., through her father, was a member covered by the Plan, a self-funded employee welfare benefits plan sponsored by Swedish Health Services (Swedish).  Dkt. # 2 at 2; AR_000226.  PHP, the Plan's claims administrator, handled members' claims for medical benefits under the Plan.  AR_000226–27.

B.    The Plan

1.    Plan terms

The Plan covers only "medically necessary" treatment, defined as:

A medical service or supply that meets all the following criteria:
It is required for the treatment or diagnosis of a covered medical condition.
It is the most appropriate supply or level of service that is essential for the diagnosis or treatment of the patient's covered medical condition. . . .

AR_000122.  "The fact that a service or supply is furnished, prescribed or recommended by a physician or other provider does not, of itself, make it medically necessary."  *Id.* The Plan excludes from coverage "wilderness programs that focus primarily on education, socialization or delinquency" and "therapeutic schools."  AR_000071–73.

Also, with prior authorization, the Plan covers non-emergency residential mental health services that are medically necessary.  AR_000041; AR_000062; AR_000084–85.  If prior

---

[1] Citations to the administrative record (AR) reflect the page numbers assigned by Defendants in the lower right-hand corner of each document.  *See* Dkts. ## 47, 47-1, 47-2, 47-3, 47-4, 48.

authorization is not obtained but the service is verified as medically necessary, the Plan covers the service, but the patient incurs a $300 penalty.  AR_000041.  Under the Plan, residential treatment programs provide "a 24-hour level of care seven days a week for patients with long-term or severe mental health or chemical dependency conditions," where "[c]are is medically monitored, with 24-hour medical and nursing availability."  AR_000122.  Residential treatment programs require "at least weekly physician visits."  AR_000277.

2.    Optum Guidelines

The Plan covers non-emergency residential mental health services when authorized by PHP's authorizing agent, Optum, "under standards generally applied by Optum."  AR_000062; AR_000100.  Optum relies on its "Level of Care Guidelines" for mental health conditions (Guidelines), which it describes as a "set of objective and evidence-based behavioral health criteria used by medical necessity plans to standardize coverage determinations."  AR_000278. The Guidelines' common admission criteria for all levels of care require that:

> The member's condition and proposed service(s) are covered by the benefit plan. AND . . .
> The member's current condition cannot be safely, efficiently, and effectively assessed and/or treated in a less intensive level of care. . . . AND
> The member's current condition can be safely, efficiently, and effectively assessed and/or treated in the proposed level of care.  Assessment and/or treatment of the factors leading to admission require the intensity of services provided in the proposed level of care. . . .

AR_000279; AR_000293.

The Guidelines define a residential treatment center as: "A sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient."  AR_000286; AR_000300.  The Guidelines' residential treatment center admission criteria require first that the member satisfy

the common admission criteria.  AR_000287; AR_000301.  The Guidelines' second and third

criteria require that:

> The member is not in imminent or current risk of harm to self, others, and/or
> property. AND
> The factors leading to admission cannot be safely, efficiently, or effectively
> assessed and/or treated in a less intensive setting due to acute changes in the
> member's signs and symptoms and/or psychosocial and environmental factors.

*Id.*

C.     H.-W.'s Medical History

The AR reflects H.-W.'s history of behavioral problems, mental health diagnoses, and

treatment efforts.  In 2011, when she was around 10 years old, H.-W. was diagnosed with bipolar

disorder, generalized anxiety disorder, and oppositional defiance disorder.  AR_001463;

AR_001558; AR_001600.  She was prescribed medications to stabilize her mood, including

Lithium, Tegretol, Seroquel, and Focalin.  AR_001464; AR_001558; AR_001734.  In February

2013, H.-W. called the police, believing her mother was poisoning her with her medications.

AR_001464.  H.-W. was transported to the hospital, but she returned home because there were

no available beds in the inpatient psychiatric unit.  *Id.*  Later that year, H.-W. shared for the first

time suicidal ideas with her mother, such as "jumping off a roof."  AR_001464; AR_001559.  In

July 2013, after becoming increasingly argumentative and "having destructive tantrums" in her

house, she was admitted to the inpatient psychiatric unit at Seattle Children's Hospital for eight

days.  AR_001464.

Between the summer of 2013 and summer of 2016, H.-W.'s condition improved, before

worsening again in the fall of 2016.  *See* AR_001465.  In December 2016, H.-W. began cutting

herself superficially with scissors.  AR_001465; AR_001560; AR_001642; AR_007773–75.

Around this period, she prepared a "suicide kit," containing a mixture of Adderall, Tylenol, and

alcohol.  AR_001465; AR_007776–78.

On April 20, 2017, H.-W. was admitted to the University of Utah Neuropsychiatric Institute (UNI), an inpatient psychiatric hospital. AR_001602. She remained at UNI for three months. AR_001442. During her stay, H.-W. "did not engage in any self harm, aggression or treatment refusal." AR_001442–43. While there, H.-W. was diagnosed with Autism Spectrum Disorder. AR_001442. Upon her discharge, the UNI treatment team "strongly recommend[ed] a long-term residential treatment placement," advising that if she "returns home, resumes outpatient treatment, and attends a regular public high school, she [would be] at high risk of becoming a danger to herself and reverting to a state of emotional, social, and academic dysfunction." AR_001602. UNI recommended residential treatment for H.-W. to "receive medication management, family therapy, and individual therapy." AR_001655. But when H.-W. was discharged, she was less argumentative and had no self-harm or suicidal ideations. AR_001423; AR_001657. Her doctors stated, "At the time of discharge, [H.-W.] did not represent an acute or imminent danger to herself or others and, as such, was appropriate for discharge . . . ." AR_001657. According to the discharge summary, H.-W. was being sent "to Pacific Quest wilderness program until an opening [became] available at Maple Lake." AR_001655.

D.    H.-W.'s Treatment at Pacific Quest (June 28, 2017 to August 31, 2017[2])

Pacific Quest's promotional brochure states that during a typical stay, students may take academic courses and engage in "practical life skills," such as "meal planning, cooking, and self-care." AR_001756. During her stay, H.-W. engaged in yoga, strength training, hiking, and

---

[2] The AR contains minor inconsistencies about the dates H.-W. left Pacific Quest and arrived at Maple Lake. PHP's denial notice states that she stayed at Pacific Quest until August 31, 2017. AR_001455. Yet Plaintiffs' first Maple Lake appeal states that H.-W. was discharged from Pacific Quest on August 29 and did not arrive at Maple Lake until August 31 due to travel between the facilities. AR_001561. PHP's Maple Lake notices say that she arrived at Maple Lake either August 30 or August 31, 2017. AR_001401; AR_006977. These minor inconsistencies do not affect the analysis herein.

swimming.  AR_001441.  H.-W. participated in "different projects in camp," including maintaining a gecko habitat, "making items with duct tape," and "rebuilding rock walls." AR_001443.  H.-W. attended classes, such as Hawaiian Culture and Environmental Literacy, for which she received an academic transcript.  AR_008240.

Around early 2018, Plaintiffs submitted to PHP a claim for reimbursement.  Pacific Quest had billed Plaintiffs for residential treatment.  AR 8218–22.  In March 2018, Plaintiffs sent to PHP the medical records from H.-W.'s stay at Pacific Quest, per PHP's request.  AR_001421; AR_008217.  The Pacific Quest records did not include individual therapy notes, group therapy notes, or physician notes, *see* AR_001421–46, AR_008217–48, despite Pacific Quest's brochure stating that participants receive two individual therapy sessions per week, AR_001753.  Pacific Quest's discharge summary describes H.-W.'s "therapeutic process" for each week of her stay, chronicling more of her activities.  AR_001443–45.  For example, it says that H.-W. "harvested fruit in camp" and "led a landwork project to chop down a banana tree and expressed feeling 'proud' of herself."  AR_001444.  On another occasion, H.-W. "was given a large role in camp regarding meal preparation," and she said that "cooking was helpful for her self-regulation."  *Id.* The discharge summary lists H.-W.'s main concerns as "anxiety, apparent manipulative use of self-harm talk and gestures, continued emotional instability, fragile self-concept, . . . mood swings, [and] poor social skills."  AR_001445.  H.-W.'s completed treatment goals included increasing distress tolerance and decreasing suicidal ideation.  AR_001443.  Future treatment goals were "developing healthy coping skills and increase emotional awareness control" and "improve social skills."  *Id.*

On April 13, 2018, PHP denied coverage for lack of prior authorization.  AR_007010–13; AR_008167.

1.      First appeal

On September 23, 2018, Plaintiffs submitted a "first level appeal," asserting that they should have been charged only the $300 fee for not obtaining prior authorization, and that the treatment was medically necessary.  AR_001408.  On October 15, 2018, Dr. Saul Helfing, a physician certified in psychiatry, reviewed H.-W.'s appeal and the Pacific Quest records.  AR_001396–97.  Dr. Helfing commented how Pacific Quest's "admission note did not report any acute need for 24 hour care."  AR_001396.  Dr. Helfing expressed:

> The leading diagnosis for admission to residential treatment was Generalized Anxiety Disorder which was characterized by the patient's reluctance to . . . leave the home and go to school. . . . The discharge summary indicated that the residential program at [Pacific Quest] focused on outdoor activities and socialization.  There was little indication that there was weekly medical follow up.  No therapy or physician notes were included for review.  The program appeared to be an outdoor school more so than an actual residential program. . . . Care could have been provided closer to home in the Seattle area with a partial hospital program, individual and family therapies and community sponsors.

*Id.*  Dr. Helfing recommended denial of coverage.  *Id.*  On October 25, 2018, PHP denied Plaintiffs' first appeal:

> The clinical information provided did not provide evidence that you required 24 hour monitoring of your medical and or psychiatric treatment.  Specifically[,] there is no evidence that you were acutely suicidal, with intent or plan, homicidal, acutely psychotic or gravely disabled and a secure therapeutic setting to assure safety was not required.  Your care could have safely been provided in a less restrictive setting, such as at the partial hospitalization level of care.[3]

AR_001454–55.

2.      Second appeal

About six months later, on April 22, 2019, Plaintiffs submitted a second appeal, titled as a "level one member appeal" appeal.  AR_006981; AR_007979.  The Plan mandates filing a first

---

[3] Compared to residential treatment, less intensive levels of care include the "Partial Hospitalization Program," offering 20 hours per week of non-residential treatment, and "Intensive Outpatient" services, offering six to nine hours per week of non-residential treatment.  AR_000282–96.

level appeal within 180 days of the initial adverse benefit determination.  AR_000209.  If

unsatisfied with the first level appeal decision, a second level appeal must be filed within 60 days

of that decision.  AR_000208.  Failure to meet this deadline renders the first level appeal

decision final.  *Id.*  In their second appeal, Plaintiffs stated that PHP's notice denying their first

appeal "included a new denial reason (medical necessity)."  AR_006981.  Plaintiffs' second

appeal also chronicled more of H.-W.'s past mental health struggles and attached articles about

the benefits of wilderness therapy.  AR_006986–89; AR_7018–7743.  On April 24, 2019, PHP

informed Plaintiffs that their second appeal, which PHP construed as a second level appeal, was

untimely.  AR_007979.  PHP offered Plaintiffs 30 days to submit an explanation for why they

did not appeal within the appropriate timeframe.  *Id.*  Plaintiffs said that because PHP's initial

denial was for lack of prior authorization rather than lack of medical necessity, Plaintiffs had 180

days to appeal.  AR_001480.  On June 3, 2019, PHP upheld its denial of Plaintiffs' first appeal

and its denial of benefits.  AR_001515.  PHP's denial was final.  *Id.*

E.       H.-W.'s Treatment at Maple Lake (August 31, 2017 to April 30, 2018)

        H.-W. stayed at Maple Lake for eight months.  AR_001394; AR_001401.  In general, the

Maple Lake records show: H.-W. entered Maple Lake because of her Autism Spectrum Disorder

diagnosis and her "mood fluctuations and anxiety."  AR_001172.  When H.-W. arrived at Maple

Lake, she was not reporting any psychosis, obsessions, or compulsions.  AR_001363.  Her most

recent self-harm incident had been around October or November 2016, almost a year before her

arrival at Maple Lake.  AR_001364.  While at Maple Lake, she presented no risk of harm to

herself or others.  *Id.*; AR_000396; AR_001186; AR_001385.  H.-W. participated in individual

therapy sessions less than once a week and group therapy sessions about twice a week.  *See*

*generally* AR_000310–AR_001387.  Therapy sessions were often canceled when H.-W. was on

a "pass," meaning she received approval to leave campus, such as for spring break, holiday

break, a camping trip, a snowmobile trip, and for H.-W.'s participation at a martial arts competition. *See, e.g.*, AR_000310; AR_000318; AR_000580; AR_000821; AR_000845; AR_000985; AR_001305; AR_001390. Out of the around 1,000 pages of records, most describe H.-W.'s academic schooling, of which she received report cards for various terms. *See* AR_000310–AR_001387. H.-W. took Biology, Math, Drama, English, and Robotics, among other courses. AR_000422; AR_000725. Outside of class, she went camping, horseback riding, watched movies, and completed chores. *See, e.g.*, AR_000383; AR_000406; AR_001257; AR_001294; AR_001390.

After H.-W. left Maple Lake, Plaintiffs submitted a claim for reimbursement to PHP. AR_001401. PHP's initial reviewer, Ms. Erica Degonia, noted that Maple Lake was a therapeutic boarding school and that during H.-W.'s stay, she never expressed any suicidal ideations, did not exhibit aggressive behaviors, and did not engage in any self-harm. AR_001390. Ms. Degonia also highlighted how the Maple Lake records showed that H.-W. "appeared to be in a good mood on some days," such that she often spent time away from Maple Lake. *Id.* Ms. Degonia concluded that H.-W. could have been safely treated at an intensive outpatient facility in the Seattle area rather than receive care at an out-of-state facility, but she asked for a Medical Director to review the claim. *Id.*

Dr. Kaizad Munshi, a physician certified in psychiatry, neurology psychiatry, and child and adolescent psychiatry, reviewed Plaintiffs' claim. AR_001390–94; AR_001402. Dr. Munshi observed that the care H.-W. received at Maple Lake focused on her "behavioral outbursts," "oppositional-defiance," and "behavioral dysregulation." AR_001393. But H.-W. exhibited no suicidal ideation or psychosis, she presented no imminent safety concern, and the Maple Lake treatment "was long term and not designed to address acute issues." *Id.* Thus, Dr. Munshi opined that the medical records did not "support the intensity of treatment expected in a

residential treatment program," and that H.-W. did not "need the 24 hour monitoring provided in a residential setting." *Id.* Dr. Munshi found that based on the residential treatment Guidelines, H.-W.'s care at Maple Lake was not medically necessary because she could have received appropriate care through intensive outpatient services, a level of care that does not provide around-the-clock monitoring. *Id.* The same day, PHP denied coverage:

> Your child was admitted for intensive treatment of her behavioral dysregulation from 08/31/2017 through 04/30/2018. Her behavior was in better control for the dates of service in question. Her symptoms were long-standing and not acute. She did not need the 24 hour monitoring provided in a residential setting. Based on our Level of Care Guidelines for the Mental Health Residential Treatment Services Level of Care, it is my determination that no authorization can be provided . . . for 215 days at Maple Lake Academy.

AR_001401.

1.      First appeal

On January 27, 2019, Plaintiffs submitted their first level appeal. AR_006928–74. They argued that Dr. Munshi erred in focusing on the acuity of H.-W.'s symptoms, rather than her chronic symptoms, and that prior providers recommended that H.-W. receive residential treatment. AR_006930. Dr. Thomas Hamlin reviewed Plaintiffs' appeal and concluded that H.-W.'s care at Maple Lake did not meet the Guidelines because:

> [H.-W.] did not require the medical supervision of the residential treatment level of care. She was intermittently oppositional[,] but she was not aggressive or violent. . . . She was rigid but she was able to cooperate [to] express her feelings. The member took her medications as prescribed. The member attended all therapies[,] at times reluctantly. The member appears to [have] been treated at [a] therapeutic boarding school. She did not appear to require the restriction of the residential treatment level of care. She could [have] been treated at the mental health partial hospital level of care.

AR_006975–76. On March 13, 2019, PHP upheld its denial:

> The clinical information provided did not provide evidence that your daughter required 24 hour monitoring for her medical and or psychiatric treatment. Specifically[,] there is no evidence that she was acutely suicidal, with intent or

plan, homicidal, acutely psychotic or gravely disabled and a secure therapeutic setting to assure safety was not required.

Your daughter[']s care could have safely been provided in a less restrictive setting, such as at the intensive outpatient level of care. Therefore, we are unable to comply with your request to approve residential mental health treatment at Maple Lake Academy [from] August 31, 2017 through April 30, 2018 as the criteria for coverage of this level of care were not met.

AR_006977–78.

2.      IRO review

Plaintiffs requested an external review by an independent review organization (IRO), articulating the same reasons for why they felt PHP wrongfully denied H.-W.'s claim. AR_008043–45. PHP sent Plaintiffs' request to an IRO, including H.-W.'s entire claim file. AR_001534–36. The IRO upheld the denial, concluding that H.-W.'s stay at Maple Lake was not medically necessary. AR_008141–44. The IRO stated that while H.-W. had a "history of psychiatric treatment in the past" and "a history of acute inpatient psychiatric hospitalizations in the past," at the time of her admission to Maple Lake, "she had no significant ongoing symptoms that required residential treatment." AR_008142. The IRO continued: "Treatment at a residential level of care with a 24-hour structured setting is required when there are significant safety concerns that require daily monitoring, significant functional impairments related to behavioral symptoms including impairments in self-care and activities of daily living, or significant substance use affecting daily functioning[.]" *Id.* But the IRO noted that H.-W. presented no symptoms that required 24-hour monitoring. *Id.* She did not have symptoms suggestive of psychosis, nor did she have any symptoms of mania. *Id.* The IRO concluded that H.-W. could "have been managed safely in a less restrictive setting and lower level of care." *Id.*

On June 26, 2020, Plaintiffs filed their complaint in the District of Utah. Dkt. # 2. On October 1, 2021, the case was transferred to this district. Dkt. # 26.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# III

## DISCUSSION

A.    ERISA Claim to Recover Benefits

    1.    Legal standard

        Under ERISA, a qualifying plan "participant" may bring a civil action in federal district court "to recover benefits due to [them] under the terms of [their] plan, to enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  The parties do not dispute that H.-W. is a participant under a qualifying plan.

    2.    Standard of review

        The Court must decide whether to review the benefits denials de novo or for abuse of discretion.  De novo is the default standard of review.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006).  But "[w]here an ERISA Plan grants discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a plan administrator's interpretation of a plan is reviewed for abuse of discretion." *O'Rourke v. N. Cal. Elec. Workers Pension Plan*, 934 F.3d 993, 998 (9th Cir. 2019) (quoting *Lehman v. Nelson*, 862 F.3d 1203, 1216 (9th Cir. 2017)).

        Defendants say that abuse of discretion applies because of the Plan's language conferring discretionary authority to both Swedish and PHP.  Dkt. # 44 at 20–22.  The Court agrees.  The Plan unambiguously delegates discretion to Swedish, its plan administrator, "to determine eligibility for benefits and to construe the terms of the Plan."  AR_000014.  In turn, Swedish delegated discretion to PHP, its claims administrator, to decide eligibility for benefits: "As Claims Administrators for the Plans described above, these entities—subject to Swedish Health Services' authority as Plan Administrator—have discretionary authority to interpret plan

provisions, to decide questions of eligibility for coverage or benefits under the Plan, to adjudicate claims, and to decide any appeals of denied claims."  AR_000227.

Even when an ERISA plan's language confers discretionary authority to the plan administrator, review is de novo if the plan administrator "engages in wholesale and flagrant violations of the procedural requirements of ERISA."  *Abatie*, 458 F.3d at 971.  Most procedural errors do not alter the standard of review.  *Id.* at 972.  Plaintiffs agree that such severe procedural violations are not present here.  *See* Dkt. # 51 at 38 ("Plaintiffs do not maintain that this case meets the rare circumstances where the *Abatie* test calls for a de novo review.").  At oral argument, Plaintiffs seemed to concede that abuse of discretion is the proper standard of review. Further, as the Plan is self-funded, it is not subject to Washington insurance regulations that may alter the standard of review.[4]  Because this case does not "fall into that rare class of cases" that mandate de novo review based on procedural ERISA violations, the Court reviews Defendants' benefits denials for an abuse of discretion.  *Abatie*, 458 F.3d at 972.

3.      Abuse of discretion review

Under an abuse of discretion review of an ERISA benefits denial, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual

---

[4] On October 17, 2022, the Court ordered the parties to submit supplemental briefing on whether Washington Administrative Code (WAC) 284-44-015 mandates de novo review.  *See* Dkt. # 61.  In the Washington health care services context, "[n]o contract may contain a discretionary clause."  WAC 284-44-015.  A "discretionary clause" is one that results in "the standard of review of a carrier's interpretation of the contract or claim decision [being] other than a de novo review."  *Id.*  Because the Plan is an employer self-funded health plan, rather than an insurance contract, it is not subject to the insurance regulation.  *See FMC Corp. v. Holliday*, 498 U.S. 52, 54 (1990).  And ERISA appears to preempt WAC 284-44-015 from applying to self-funded ERISA plans.  *See FMC Corp.*, 498 U.S. at 61 ("We read [ERISA's] deemer clause to exempt self-funded ERISA plans from state laws that 'regulat[e] insurance' within the meaning of [ERISA's] saving clause."); *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1135–36 (9th Cir. 2017) ("[I]f the state law is applied to an ERISA plan itself, which is how such laws operate on self-funded plans, the law falls within the deemer clause and thus is preempted . . . .").  Plaintiffs agree. *See* Dkt. # 63 at 2 ("Because the Plan in this case is self-funded, *Williby* would seem initially to stand for the proposition that ERISA preempts WAC 284-44-015 from applying to the Plan.").

tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 706 (9th Cir. 2012) (quoting *Nolan v. Heald Coll.*, 551 F.3d 1148, 1153 (9th Cir. 2009)).  In deciding whether a plan administrator abused its discretion, the Court asks whether it is "left with a definite and firm conviction that a mistake has been committed." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)).  "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (internal citation omitted).  "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits.  It means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Conkright v. Frommert*, 559 U.S. 506, 521 (2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).  This reasonableness standard requires deference to the plan administrator's benefits decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa*, 642 F.3d at 676 (internal citation omitted).  The Court also weighs any "procedural irregularities" in deciding whether an administrator's benefits denial was an abuse of discretion.  *Abatie*, 458 F.3d at 972.

Plaintiffs say that Defendants abused their discretion by violating ERISA's procedural requirements and erroneously applying the Guidelines for admission to a residential treatment center.  The Court "may review only the [AR] when considering whether the plan administrator abused its discretion." *Id.* at 970.  Having considered the AR, the Court concludes Defendants' denials of benefits were reasonable and not an abuse of discretion.

a.     Alleged procedural violations

ERISA plans must maintain a procedure for claimants to appeal an adverse benefit determination and "under which there will be a full and fair review of the claim and the adverse benefit determination."  29 C.F.R. § 2560.503-1(h)(1).  "The Ninth Circuit does not require strict compliance with ERISA's procedural requirements."  *Finkelstein v. Guardian Life Ins. Co. of Am.*, No. C 07-01130 CRB, 2008 WL 8634992, at *4 (N.D. Cal. Nov. 23, 2008).  Rather, "substantial compliance with these requirements is sufficient."  *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1032 (9th Cir. 2006).  Plaintiffs say Defendants committed certain "severe" procedural violations, which render each denial of benefits an abuse of discretion.  Dkt. # 51 at 37–38.

i.     PHP's review of Plaintiffs' appeals

ERISA requires plan administrators to "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim."  29 C.F.R. § 2560.503-1(h)(2)(iv).  Plaintiffs say Defendants violated this requirement in three ways.[5]

First, Plaintiffs challenge the wording of Defendants' "boilerplate" denial notices, which include statements like "[h]er symptoms were long-standing and not acute," AR_001401, in

---

[5] Plaintiffs do cite two other ERISA procedures they say Defendants violated. Dkt. # 51 at 37. But they do not offer argument related to either procedure.  First, plan administrators must provide a claimant "upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii). Plaintiffs fail to identify an instance when they asked PHP to provide access to such information and PHP denied their request.  Second, "in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment," plan administrators must "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." *Id.* § 2560.503-1(h)(3)(iii). Plaintiffs do not show how the health care professionals who reviewed H.-W.'s claims had inadequate training or experience.  For example, one of the physician reviewers, Dr. Munshi, was certified in psychiatry, neurology psychiatry, and child and adolescent psychiatry. AR_001390–94; AR_001402. PHP also informed Plaintiffs about the medical qualifications of its reviewers. *See, e.g.*, AR_006977 (claim reviewed by an "MD Board Certified in Family Medicine" and a physician "Board Certified in Psychiatry").  The Court thus concludes that Defendants violated neither ERISA procedure.

arguing that PHP refused to "meaningfully engage with [H.-W.]'s medical history."  Dkt. # 51 at 37.  The Court reads the denial notices differently.  For example, the Guidelines require acute symptoms to warrant admission for residential treatment.  *See* AR_000287 ("The factors leading to admission cannot be safely . . . treated in a less intensive setting due to acute changes in the member's signs and symptoms . . . .").  PHP stating that H.-W.'s symptoms were not acute helps explain why her Maple Lake stay was not covered.  Plaintiffs suggest that Defendants erred in not sufficiently focusing on the medical records they submitted from when H.-W.'s mental health struggles began.  Dkt. # 51 at 37-38.  The Plan does not mandate such an emphasis on older medical records, and neither does ERISA.  Instead, the admission criteria for residential treatment include whether the "service[] will improve the member's presenting problems," AR_000279, and that "[t]he factors leading to admission cannot be safely . . . treated in a less intensive setting." AR_000287.  Thus, Defendants reasonably focused on H.-W.'s presenting problems to determine eligibility for benefits.  *See, e.g.*, AR_001390 (PHP's internal review note focusing on H.-W.'s recent and current medical issues).

Second, Plaintiffs say that Defendants should have "explain[ed] if Plaintiffs needed to submit additional documentation, or to tell them whether [H.-W.] needed to display additional symptoms for residential treatment to be warranted." *Id.* at 38.  But Plaintiffs cite no legal authority to support this argument.

Third, Plaintiffs contend Defendants ignored the recommendations of H.-W.'s prior providers, "several of whom unambiguously recommended that [H.-W.] needed further inpatient treatment." Dkt. # 51 at 38.  But as mentioned above, under the terms of the Plan, PHP was not bound to follow recommendations from prior providers in deciding whether H.-W.'s stays at Pacific Quest or Maple Lake were medically necessary.  *See* AR_000122 ("The fact that a service or supply is . . . recommended by a physician or other provider does not, of itself, make it

medically necessary.").  Plaintiffs also misrepresent portions of the AR.  For example, Plaintiffs cite the opinions of Dr. Elizabeth Botts, one of H.-W.'s physicians at UNI, as a provider who "unambiguously" recommended that H.-W. needed inpatient treatment upon discharge from UNI.  Dkt. # 51 at 38.  But Dr. Botts did not unequivocally recommend around-the-clock residential treatment.  In one section, Dr. Botts noted how the UNI treatment team recommended care at a "[residential treatment center] where [H.-W.] can receive medication management, family therapy, and individual therapy."  AR_001655.  Yet in a different section of her discharge summary, Dr. Botts suggested a "structure[d] therapeutic boarding school environment" for H.-W.'s care.  AR_001658.  The Plan excludes from coverage therapeutic boarding schools. AR_000071–73.

ii.      Timeliness of second Pacific Quest appeal

Plaintiffs ask the Court to find that their second Pacific Quest appeal was timely.  Dkt. # 51 at 38–40; Dkt. # 55 at 11–14.  Because Plaintiffs cite an ERISA procedure, *see* Dkt. # 55 at 11, the Court construes Plaintiffs' request as an argument that Defendants violated an ERISA procedure by deciding that Plaintiffs' second appeal was untimely.  Under the procedure Plaintiffs cite, when benefits are denied, plan administrators must provide claimants with the "specific reason or reasons."  29 C.F.R. § 2560.503-1(g)(1)(i).  PHP first denied Plaintiffs' Pacific Quest claim for lack of prior authorization.  AR_007010–13; AR_008167.  PHP later upheld its initial denial, basing their decision on lack of medical necessity.  AR_001454.  Each notice included the specific reason supporting the denial, as required by ERISA.

Because Plaintiffs interpreted this later decision as a new reason for denying benefits, they apparently believed they had 180 days to file a second "first level" appeal.  AR_001480. Plaintiffs submitted their second appeal within 179 days.  AR_001456.  Even if the reasons

supporting the initial denial and the first appeal were different,[6] the Plan does not state that the clock automatically restarts under those circumstances.  Under the Plan's language, if a member is "not satisfied with the decision" from the first level appeal, they "may request a voluntary second-level internal appeal."  AR_000208.  Further, it says, "You must submit your written request for the voluntary second level internal appeal within 60 days of the date of the internal grievance or appeal decision notice, or that initial decision will become final."  *Id.*  Because Plaintiffs submitted their second appeal outside the 60-day window, their second appeal was untimely.

Thus, Defendants' review of H.-W.'s claims and their denial of Plaintiffs' second Pacific Quest appeal for timeliness were not abuses of discretion.

### b.  Application of the Guidelines

Plaintiffs say Defendants abused their discretion by misapplying the Guidelines for admission to residential treatment.  Dkt. # 51 at 40.  The Guidelines list three criteria that must be met.  *See* AR_000286–87.  The parties dispute whether H.-W. satisfied the second and third.

For admission to a residential treatment center, the second criterion requires that "the member is not in imminent or current risk of harm to self, others, and/or property."  AR_000287.  Plaintiffs argue that H.-W. satisfied this criterion for both admission to Pacific Quest and Maple Lake, *see* Dkt. # 51 at 46, and the Court agrees.  Directly before her arrival to Pacific Quest, H.-W.'s doctors at UNI stated that she "did not represent an acute or imminent danger to herself or others."  AR_001657.  The AR supports their assessment.  H.-W.'s most recent self-harm

---

[6] But the Court does not construe lack of prior authorization and lack of medical necessity to be independent denial reasons.  Under the Plan, denial for lack of prior authorization includes the lack of medical necessity.  *See* AR_000041.  If a service is verified as medically necessary but there was no prior authorization, the Plan's terms do not require a denial of coverage—the Plan covers the service and charges a $300 penalty.  *Id.*

incident was around October or November 2016, over six months before her arrival at Pacific Quest. AR_001364. And during her care at Pacific Quest, she similarly did not harm herself, others, or any property, which supports H.-W. meeting this criterion for her subsequent admission to Maple Lake. *See generally* AR_001422–001531. Plaintiffs point out that, in connection with the denials of the first appeals for Pacific Quest and Maple Lake, PHP's notices state: "there is no evidence that you were acutely suicidal, with intent or plan, homicidal, acutely psychotic or gravely disabled." AR_001454; AR_006977. It appears that PHP misinterpreted the criterion as requiring that the member be in imminent or current risk of harm to self, others, or property.

Notwithstanding the foregoing, all of the Guidelines' criteria must be met for the Plan to cover admission to a residential treatment. Although she met this second criterion for lack of "risk of harm to self, others, and/or property," H.-W. did not satisfy the third. AR_000287.

For admission to residential treatment, the third criterion requires that: "[t]he factors leading to admission cannot be safely, efficiently, or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms." AR_000287. The second and third criteria work together in mandating the proper severity of symptoms. Under the second criterion, residential treatment is not appropriate where the member's condition is so severe—based on risk of harm to self, others, or property—that they cannot be safely treated at a residential treatment center. And under the third criterion, residential treatment is also not appropriate if the member may be treated in a less intensive setting because her condition does not require the around-the-clock monitoring provided in residential treatment. The AR supports denying benefits for both Pacific Quest and Maple Lake based on this criterion because H.-W. could have been safely or effectively treated at a less intensive level of care. Defendants' denials based on the third criterion were not an abuse of discretion.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 19

1    Beginning with Pacific Quest, PHP denied Plaintiffs' claim, in part, because H.-W. did

2    not meet the third criterion: "[t]he clinical information provided did not provide evidence that

3    [H.-W.] required 24 hour monitoring of your medical and or psychiatric treatment" and her "care

4    could have safely been provided in a less restrictive setting."  AR_001454.  Plaintiffs contend

5    that H.-W. could not have received treatment at a less intensive setting than Pacific Quest

6    because H.-W. "was transitioning from an acute inpatient hospitalization where she had self-

7    harmed [and] threatened suicide."  Dkt. # 51 at 41.  The AR appears to reflect otherwise: During

8    H.-W.'s treatment at UNI, she "did not engage in any self harm" and when she was discharged,

9    she had no self-harm or suicidal ideations.  AR_001442–23; AR_001657.  Similarly, before her

10   discharge, H.-W. did "not endorse or demonstrate any acute signs/symptoms of acute mania or

11   psychosis" and her UNI doctors determined that H.-W. "had improved sufficiently to allow

12   transition to a less restrictive level of care."  AR_001657.

13   The AR supports PHP's determination that H.-W. did not require 24-hour monitoring for

14   her medical treatment at Pacific Quest.  Dr. Helfing, the physician who reviewed Plaintiffs' first

15   appeal, correctly identified how Pacific Quest's admission note "did not report any acute need

16   for 24 hour care."  AR_001396.  *See* AR_001423–31.  At Pacific Quest, H.-W. participated in

17   various recreational activities and attended classes, all without issue.  *See, e.g.*, AR_001441;

18   AR_008240.  Pacific Quest's discharge summary identified H.-W.'s main concerns as anxiety,

19   emotional instability, mood swings, and poor social skills.  AR_001445.  The Pacific Quest

20   records included no individual therapy notes, group therapy notes, or physician notes.  *See*

21   AR_001421-46, AR_008217-48.  This supports a finding that H.-W. did not require 24-hour

22   monitoring at Pacific Quest.  Dr. Helfing agreed: "The program appeared to be an outdoor school

23   more so than an actual residential program."  AR_001396.  The Plan excludes from coverage

24   these outdoor programs.  AR_000071.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

For Maple Lake, PHP also denied Plaintiffs' claim because H.-W. did not meet the third criterion: her "symptoms were long-standing and not acute," and "[s]he did not need the 24 hour monitoring provided in a residential setting." AR_001401. Plaintiffs dispute this conclusion because they say H.-W. "was not compliant with her treatment at Maple Lake until she had time to adjust" and she had a physical altercation with Maple Lake staff. Dkt. # 51 at 42–43. In support of their argument that H.-W. was not compliant with treatment, Plaintiffs point to H.-W.'s behavior during her first two weeks at Maple Lake. *Id.* at 43, 26–27. She tried to prevent her mother from dropping her off, she did not at first follow the facility's rules, and she slept during class, among other behavioral issues. *See, e.g.*, AR_001381; AR_001376; AR_001335. As to this altercation, the record shows that H.-W. asked a Maple Lake staff member not to touch her belongings; the staff member responded that H.-W had to "go through her stuff with staff." AR_001249. When H.-W. refused to yield, the staff member "counted to three and then grabbed her right arm and put it into a gooseneck control." *Id.* The Court is unpersuaded that this incident along with certain initial behavioral issues supported H.-W.'s claim that she needed around-the-clock residential treatment.

The AR does not show that H.-W. in fact received the 24-hour care required for residential treatment during her stay at Maple Lake. Instead, most of the Maple Lake records describe her academic schooling, chores, and various recreational activities. *See generally* AR_000310–AR_001387. While at Maple Lake, staff members often described her "positive" demeanor as she engaged in such activities. *See, e.g.*, AR_000392 (H.-W. "smiled and joked around with different members of the community"); AR_001284 (H.-W. "displayed positive affect by talking cheerfully with staff"); AR_001371 ("Student seemed happy as evidenced by her . . . holding pleasant conversations with peers.").

1    In addition, the fact that H.-W. did not receive the level of care expected at a residential

2    treatment center supports PHP's determination that she could have received treatment at a less

3    intensive setting.  *See Loran K. v. Blue Cross & Blue Shield of Illinois*, No. 19-CV-07694-JSW,

4    2021 WL 4924777, at *7 (N.D. Cal. June 17, 2021) (explaining that a "therapeutic boarding

5    school" that included "a therapeutic approach with academics" did not provide the "twenty-four-

6    hour medical monitoring required of a [residential treatment center]").  H.-W. also left Maple

7    Lake many times because of school breaks or other trips, suggesting she did not require the 24-

8    hour care provided in residential treatment.  Defendants highlight how various medical reviewers

9    during Plaintiffs' appeals expressed that H.-W. could have been treated at a less intensive level

10   of care.  *See* AR_001390–96.  And despite H.-W.'s history of behavioral problems, none were

11   acute.  When she arrived at Maple Lake, her physician reported no psychosis, obsessions, or

12   compulsions.  AR_001363.

13          In sum, on this record, the Court cannot say that Defendants' denials of Plaintiffs' Pacific

14   Quest and Maple Lake claims were an abuse of discretion.  Defendants reasonably determined

15   that H.-W. did not meet the third criterion for admission to a residential treatment center.  *See*

16   *Conkright*, 559 U.S. at 521 (holding that under an abuse of discretion review, "the plan

17   administrator's interpretation of the plan will not be disturbed if reasonable") (internal quotation

18   omitted); *see also Salomaa*, 642 F.3d at 676 (a plan administrator's denial of benefits is

19   reasonable unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that

20   may be drawn from the facts in the record") (internal citation omitted).

21                  c.      Adequacy of denial notices

22          Plaintiffs contend that Defendants' denial notices were abuses of discretion because they

23   were issued without explanation.  Dkt. # 59 at 12–13.  *See Boyd*, 410 F.3d at 1178 (holding that

24   an "ERISA administrator abuses its discretion [if it] renders a decision without explanation").

1  Relatedly, Plaintiffs assert that Defendants skirted ERISA's procedure requiring that if a plan

2  administrator's denial is based on lack of medical necessity, the notice must include "an

3  explanation of the scientific or clinical judgment for the determination, applying the terms of the

4  plan to the claimant's medical circumstances." 29 C.F.R. § 2560.503-1(g)(1)(v)(B).

5  In the Pacific Quest denial correspondence after Plaintiffs' first appeal, PHP outlined

6  how it had made its decision, including: (1) that PHP had consulted various physicians who

7  reviewed Plaintiffs' claim; (2) a review of all clinical information provided by Pacific Quest; and

8  (3) a description of the Guidelines for determining medical necessity. AR_001454. PHP

9  concluded that "[t]he clinical information provided did not provide evidence that [H.-W.]

10  required 24 hour monitoring of [her] medical and or psychiatric treatment." *Id.* Further, PHP

11  stated that her "care could have been safely provided in a less restrictive setting, such as at the

12  partial hospitalization level of care." AR_001454–55. This explanation, while brief, was

13  supported by the AR.

14  PHP's initial denial for Maple Lake, written by Dr. Munshi, explained: "Her behavior

15  was in better control for the dates of service in question. Her symptoms were long-standing and

16  not acute. She did not need the 24 hour monitoring provided in a residential setting."

17  AR_001401. The notice properly stated that PHP's decision was based on the medical necessity

18  Guidelines. *Id.* PHP's denial for Plaintiffs' first Maple Lake appeal resembled the first Pacific

19  Quest appeal denial. *See* AR_006977–78. The notice walked through the Guidelines for

20  determining medical necessity before concluding that H.-W. did not require 24-hour monitoring

21  and her "care could have been safely provided in a less restrictive setting." AR_006977–78.

22  These conclusions were also supported by the AR.

23  Defendants provided enough explanation for Plaintiffs to understand the denials. Giving

24  a consistent reason for their denials—lack of medical necessity, based on the Guidelines' criteria,

and that H.-W. could have received care in a less restrictive setting because she did not need 24-hour care—is sufficient.  *See Mercier v. Boilermakers Apprenticeship & Training Fund*, No. CIV.A 07-CV-11307DPW, 2009 WL 458556, at *17 (D. Mass. Feb. 10, 2009) ("So long as the plan participant is provided a sufficient explanation to formulate further challenges to the denial, it is not necessary for an administrator to provide 'the reasoning behind the reasons.'") (quoting *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996)).  PHP also provided proper reference to the plan provisions under which it denied H.-W.'s claims.  Each denial notice explained that PHP had conducted a medical necessity review.  Plaintiffs could understand, and seem to have understood, that their claims were denied due to lack of medical necessity.  Although these explanations could have been more thorough, they were not abuses of discretion as the Court is not "left with a definite and firm conviction that a mistake has been committed." *Salomaa*, 642 F.3d at 676.

B.      Parity Act Claim

        The parties request judgment in their favor for Plaintiffs' claim based on Defendants' alleged Parity Act violation.  Dkt. # 51 at 46–49; Dkt. # 57 at 18–26.

        Section 1132(a)(3) of ERISA provides that a civil action may be brought "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).  The purpose of section 1132(a)(3), a "catchall" provision, is to "act as a safety net, offering appropriate equitable relief for injuries caused by violations that [section 1332] does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).  "Because the [Parity Act] is enacted as part of ERISA, it is enforceable through a cause of action under § 1132(a)(3) as a violation of a 'provision of this subchapter.'" *A.F. ex rel. Legaard v. Providence Health Plan*, 35 F. Supp.

3d 1298, 1304 (D. Or. 2014) (quoting 29 U.S.C. § 1132(a)(3)).  *See also Munnelly v. Fordham Univ. Fac.*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018) (noting that while the Parity Act lacks a private right of action, portions of it are "incorporated into ERISA and may be enforced using the civil enforcement provisions in ERISA") (internal citation omitted).  Because a Parity Act violation involves a substantive ERISA violation instead of a violation of the Plan's terms, district courts owe no deference to the plan administrator's interpretation.  *Kevin D. v. Blue Cross & Blue Shield of S.C.*, 545 F. Supp. 3d 587, 613 (M.D. Tenn. 2021).  Thus, the Court's review is de novo, and the plaintiff bears the burden of proof.  *Stone v. UnitedHealthcare Ins. Co.*, 979 F.3d 770, 774 (9th Cir. 2020).

The Parity Act prohibits an ERISA plan from imposing more restrictive "treatment limitations" for mental health benefits than for medical or surgical benefits.  *See* 29 U.S.C. § 1185a(a)(3)(A).  Treatment limitations include "both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage."  29 C.F.R. § 2590.712(a).  Nonquantitative treatment limitations for benefits include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness."  29 C.F.R. § 2590.712(c)(4)(ii).  The limitations Plaintiffs allege in their complaint are nonquantitative.  Dkt. # 2 at 14.

The Parity Act does not require that mental health treatment benefits are identical to medical and surgical treatment benefits.  Rather, for nonquantitative treatment limitations, the Parity Act requires that all "processes, strategies, evidentiary standards, or other factors used in applying" the limitation to mental health benefits must be "comparable to" and "applied no more stringently than" those used in applying the limitation for medical and surgical benefits.  29 C.F.R. § 2590.712(c)(4)(i).  The parties agree that skilled nursing facilities and inpatient

rehabilitation facilities for medical or surgical care are analogous to residential treatment facilities for mental health care.  Dkt. # 51 at 47; Dkt. # 57 at 21.

When bringing a claim for a Parity Act violation, a claimant may allege an impermissible limitation based on the plan's terms, a "facial" challenge, or based on the plan administrator's application of the plan, an "as applied" challenge.  *D.T. by & through K.T. v. NECA/IBEW Fam. Med. Care Plan*, No. 2:17-CV-00004-RAJ, 2019 WL 6894508, at *5 (W.D. Wash. Dec. 18, 2019).  Plaintiffs bring an as-applied challenge, Dkt. # 51 at 48, meaning they must prove that Defendants differentially applied a facially neutral plan term.[7]  *Id.* at *6.

Plaintiffs contend that Defendants' application of their medical necessity criteria, a nonquantitative treatment limitation, improperly required acute symptoms evidencing a risk of harm to self or others for admission to residential treatment, but that acute requirements do not exist for analogous medical or surgical treatment.  Dkt. # 51 at 48–49.  This disparity, Plaintiffs say, violates the Parity Act because it is a more stringent limitation for mental health care.  *Id.* Plaintiffs state that Defendants denied H.-W.'s claims because she was not "acutely suicidal, with intent or plan," "homicidal," "acutely psychotic," or "gravely disabled."  AR_001454, AR_006977.  Because the admission criteria Defendants use for skilled nursing or inpatient rehabilitation facilities do not similarly require members to be "acutely suicidal, with intent or plan," "homicidal," "acutely psychotic," or "gravely disabled," Plaintiffs say Defendants violated the Parity Act.  Dkt. # 51 at 48.  The Court disagrees for two main reasons.

First, Defendants did not necessarily require H.-W. to be "acutely suicidal, with intent or plan," or for her to exhibit the other three acute symptoms, to render her admission to residential treatment medically necessary.  Granted, as discussed above, PHP misinterpreted the second

---

[7] The Court notes that the Plan applies a singular definition of "medically necessary" care for both mental health services and medical or surgical services.  AR_000032; AR_000276.

criterion.  But the Guidelines required H.-W. to satisfy all three criteria to warrant admission to a residential treatment center.  *See* AR_000286–87.  And the AR supports PHP's determination that H.-W.'s admission at both facilities was not medically necessary based on the third criterion because she could have received treatment in a "less intensive setting."  AR_000287.  Thus, Plaintiffs cannot prevail on their Parity Act claim because their basis for comparing medical necessity criteria between mental health and medical or surgical treatment—that Defendants allegedly require members to be acutely suicidal, homicidal, acutely psychotic, or gravely disabled—is not necessarily correct.

Second, Plaintiffs offer no evidence for how Defendants applied their medical necessity criteria for residential mental health treatment more restrictively than for skilled nursing facilities and inpatient rehabilitation facilities in the medical or surgical care context.  For example, Plaintiffs submit no evidence that Defendants applied "processes, strategies, [and] evidentiary standards" more stringently in resolving claims for residential treatment than for analogous medical or surgical claims.  29 C.F.R. § 2590.712(c)(4)(i).  And contrary to Plaintiffs' assertion, the analogous guidelines in fact require acute symptoms for admission to skilled nursing or rehabilitation services for certain conditions.  *See, e.g.*, Dkt. # 51-2 at DEF_0011.  District courts around the country have come to similar conclusions in analogous cases.  *See, e.g.*, *Kevin D.*, 545 F. Supp. 3d at 617 (concluding when the defendants use the same medical necessity definition for all services that the plaintiffs "failed to satisfy their burden of proof by pointing to any actual facts that support their claim that there was disparate treatment in the way the defendants handled [the plaintiff's] claim" compared to how the defendants "evaluate claims for prolonged treatment at skilled nursing facilities and inpatient rehabilitation centers"); *Mike G. v. Bluecross Blueshield of Tex.*, No. 2:17-CV-347 TS, 2019 WL 2357380, at *16 (D. Utah June 4, 2019) ("Plaintiffs argue that the Milliman Care Guidelines improperly apply acute requirements for

sub-acute residential mental health treatment, but there is no evidence before the Court that Blue Cross applied less stringent requirements for medical/surgical benefits. Without such evidence, Plaintiffs' Parity Act claim must fail."); *Anne M. v. United Behav. Health*, No. 2:18-CV-808 TS, 2019 WL 1989644, at *3 (D. Utah May 6, 2019) (dismissing as-applied Parity Act claim because allegations that the plan "imposed greater restrictions on residential treatment for mental health than it did for medical facilities, such as skilled nursing homes" were "merely conclusory allegations devoid of factual support").

In sum, Plaintiffs' Parity Act claim fails as a matter of law.

### IV

### CONCLUSION

Based on the above reasons, the Court GRANTS Defendants' motion for summary judgment, Dkt. # 44, and DENIES Plaintiffs' motion for summary judgment, Dkt. # 51.

Dated this 23rd day of January, 2023.

John H. Chun
United States District Judge